1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9    ARIZONA CONTRACTORS                    )    No. CV07-02496-PHX-NVW (lead)
     ASSOCIATION, INC., an Arizona non-     )    No. CV07-02518-PHX-NVW (member)
10   profit corporation; ARIZONA           )
     EMPLOYERS FOR IMMIGRATION              )    **FINDINGS OF FACT, CONCLUSIONS**
11   REFORM, INC., an Arizona non-profit    )    **OF LAW, AND ORDER**
     corporation; CHAMBER OF                )
12   COMMERCE OF THE UNITED                 )
     STATES OF AMERICA, a Washington        )
13   D.C. non-profit corporation; ARIZONA   )
     CHAMBER OF COMMERCE, an                )
14   Arizona non-profit corporation;        )
     ARIZONA HISPANIC CHAMBER OF            )
15   COMMERCE, INC., an Arizona non-        )
     profit corporation; ARIZONA FARM       )
16   BUREAU FEDERATION, an Arizona          )
     non-profit corporation; ARIZONA        )
17   RESTAURANT AND HOSPITALITY             )
     ASSOCIATION, an Arizona non-profit     )
18   corporation; ASSOCIATED MINORITY       )
     CONTRACTORS OF AMERICA, an             )
19   Arizona non-profit limited liability   )
     company; ARIZONA ROOFING               )
20   CONTRACTORS ASSOCIATION, an            )
     Arizona non-profit corporation;        )
21   NATIONAL ROOFING                       )
     CONTRACTORS' ASSOCIATION, an           )
22   Illinois not-for-profit corporation;   )
     WAKE UP ARIZONA! INC., an              )
23   Arizona non-profit corporation; and    )
     ARIZONA LANDSCAPE                      )
24   CONTRACTORS ASSOCIATION,               )
     INC., an Arizona non-profit corporation,)
25                                          )
                  Plaintiffs,               )
26                                          )
     vs.                                    )
27                                          )

28

1   CRISS CANDELARIA, Apache County )
    Attorney; ED RHEINHEIMER, Cochise )
2   County Attorney; TERENCE C.           )
    HANER, Coconino County Attorney;    )
3   DAISY FLORES, Gila County Attorney; )
    KENNY ANGLE, Graham County        )
4   Attorney; DEREK D. RAPIER, Greenlee )
    County Attorney; MARTIN BRANNAN,)
5   LaPaz County Attorney; ANDREW P.   )
    THOMAS, Maricopa County Attorney;  )
6   MATTHEW J. SMITH, Mohave County )
    Attorney; JAMES CURRIER, Navajo    )
7   County Attorney; BARBARA            )
    LAWALL, Pima County Attorney;        )
8   JAMES P. WALSH, Pinal County        )
    Attorney; GEORGE SILVA, Santa Cruz )
9   County Attorney; SHEILA POLK,        )
    Yavapai County Attorney; JON SMITH, )
10  Yuma County Attorney; TERRY          )
    GODDARD, Attorney General of the    )
11  State of Arizona; and FIDELIS V.      )
    GARCIA, Director of the Arizona      )
12  Registrar of Contractors,             )
                                          )
13          Defendants.                   )
    _____)
14  VALLE DEL SOL, INC.; CHICANOS )
    POR LA CAUSA, INC.; and SOMOS )
15  AMERICA,                              )
                                          )
16          Plaintiffs,                   )
                                          )
17  vs.                                   )
                                          )
18                                        )
    TERRY   GODDARD,  in  his  official)
19  capacity as Attorney General of the State)
    of Arizona; GALE GARRIOTT, in his )
20  official capacity as the Director of the)
    Arizona Department of Revenue; and )
21  ANDREW  THOMAS,  in  his  official)
    capacity as Maricopa County Attorney, )
22                                        )
            Defendants.                   )
23  _____)

24          Plaintiffs present a facial challenge to the validity of the Legal Arizona Workers

25  Act ("the Act"), A.R.S. §§ 23-211 to 23-214 (Supp. 2007), enacted July 2, 2007, and

26  effective January 1, 2008.  2007 Ariz. Sess. Laws, Ch. 279.  The Act provides the

27  Superior Court of Arizona with the power to suspend or revoke the business licenses of

28
                                      - 2 -

1    employers who intentionally or knowingly employ unauthorized aliens.  By agreement of

2    the parties, the two cases were consolidated and accelerated for trial on January 16, 2008,

3    on stipulated facts and written evidence.  This order states findings of fact and

4    conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

5    **I.    Background**

6          **A.    Procedural History and Related Proceedings**

7                These consolidated actions are refilings, with some changes in parties, of

8    consolidated actions dismissed December 7, 2007, for lack of jurisdiction under Article

9    III of the United States Constitution.  *Arizona Contractors Ass'n v. Napolitano* (*Arizona*

10   *Contractors I*), __ F. Supp. 2d ___, 2007 WL 4293641 (D. Ariz. 2007).  Plaintiffs

11   appealed that judgment of dismissal and sought an injunction pending appeal.  They

12   concurrently filed this action (*Arizona Contractors II*), naming the county attorneys of

13   Arizona as defendants and seeking a temporary restraining order and preliminary

14   injunction against the Act's enforcement.  Plaintiffs' motions for injunctions pending

15   appeal in *Arizona Contractors I* and for temporary restraining orders in *Arizona*

16   *Contractors II* were heard on December 18 and denied on December 21, 2007.  (*Arizona*

17   *Contractors I*, Doc. # 106; *Arizona Contractors II*, Doc. # 75.)

18                The parties then stipulated to hold a consolidated preliminary injunction hearing

19   and trial on the merits in this case on January 16, 2008.  (Doc. # 135.)  At that hearing,

20   the County Attorney Defendants acknowledged that it would take them weeks or months

21   to investigate complaints and initiate any proceedings under the Act.  They avowed that

22   they would carry out their duties without intentional delay, but that they could and would

23   bring no proceedings before March.  The Joint Statement of Stipulated Facts includes all

24   of the evidence from *Arizona Contractors I* with extensive additions.

25                The Plaintiffs are the same as in *Arizona Contractors I*, with the addition of

26   Plaintiff Valle Del Sol, Inc., a non-profit corporation that employs many workers in

27   Arizona and holds various business licences.  Plaintiffs have dropped the Governor as a

28                                                    - 3 -

1  defendant and have added the County Attorneys and the Arizona Registrar of Contractors.

2  In light of the rulings in *Arizona Contractors I*, the Defendants have stipulated not to

3  contest Plaintiffs' standing before this court, but have reserved the right to raise the issue

4  on appeal.  (Doc. # 96, 106.)  The actions will be dismissed as against the Attorney

5  General for lack of justiciable case or controversy for the reasons stated in *Arizona*

6  *Contractors I*, which the court does not understand the Attorney General to be

7  abandoning.

8         **B.     State and Federal Sanctions for Employing Unauthorized Workers**

9         The court's December 7, 2007 order in *Arizona Contractors I* explained the

10  implicated statutes and made findings of fact, most of which apply equally to this case.

11  2007 WL 4293641, at *2–7.  That discussion is incorporated into this order with the

12  following summary and the following additional and, where noted, different findings.

13  With the benefit of additional briefing and study, the court finds it unnecessary to resolve

14  some of the legal questions noted in its previous orders in *Arizona Contractors I* and

15  raised in this case.

16         The federal government first created sanctions for employers of unauthorized

17  aliens in the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603,

18  100 Stat. 3359 (employer sanctions provisions codified at 8 U.S.C. § 1324a to 1324c

19  (2000)).  States at that time had authority to enact and enforce sanctions against

20  employers of unauthorized aliens.  *See De Canas v. Bica*, 424 U.S. 352 (1976).  Indeed, at

21  least twelve states had employer sanctions statutes that proscribed "knowing"

22  employment of unauthorized aliens.  U.S. IMMIGRATION POLICY AND THE NATIONAL

23  INTEREST, STAFF REPORT OF THE SELECT COMMISSION ON IMMIGRATION AND REFUGEE

24  POLICY 565 (1981).

25         IRCA expanded those state efforts to the national level.  Congress also declared

26  that IRCA "preempt[s] any State or local law imposing civil or criminal sanctions (other

27  than through licensing or similar laws) upon those who employ, or recruit or refer for a

28                                            - 4 -

1   fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).  Under federal

2   enforcement of IRCA, an administrative law judge adjudicates whether an employer

3   knowingly employed an unauthorized alien, and the decision is subject to judicial review.

4   Congress also created an employment eligibility verification system based on Form I-9,

5   which requires employees to swear that they have authorization to work and requires

6   employers to examine specific identification documents for facial validity.  § 1324a(b).

7          Congress realized that the I-9 system was imperfect.  In IRCA's text, it authorized

8   evaluation and change of the employment verification system:

9          The President shall provide for the monitoring and evaluation of the
       degree to which the employment verification system . . . provides a secure
10      system to determine employment eligibility in the United States and shall
       examine the suitability of existing Federal and State identification systems for
11      use for this purpose.

12         To the extent that the system established under subsection (b) is found
       not to be a secure system to determine employment eligibility in the United
13      States, the President shall . . . implement such changes . . . as may be necessary
       to establish a secure system to determine employment eligibility in the United
14      States.

15  § 1324a(d).  Congress later passed the Illegal Immigration Reform and Immigrant

16  Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, §§ 401–405, 110 Stat.

17  3009, 3009-655 to 3009-665 (note following 8 U.S.C. 1324a (2000)), which directed the

18  Attorney General to conduct three pilot programs to improve the employment verification

19  system.  In a section entitled "Voluntary Election to Participate in a Pilot Program,"

20  IIRIRA specified that "any person or other entity that conducts any hiring (or recruitment

21  or referral) in a State in which a pilot program is operating may elect to participate in that

22  pilot program . . . the Attorney General may not require any person or other entity to

23  participate in a pilot program." § 402, 110 Stat. at 3009-656.

24         One of the systems created by IIRIRA was formerly known as the Basic Pilot.  The

25  Basic Pilot Program Extension and Expansion Act of 2003 ("Expansion Act"), Pub. L.

26  No. 108-156, 117 Stat. 1944 (note following 8 U.S.C. § 1324a (Supp. IV. 2000)),

27  amended IIRIRA to make the Basic Pilot available to employers in all fifty states, extend

28                                              - 5 -

1   its authorization until November, 2008, and place the Secretary of Homeland Security in

2   charge of the program.  The Basic Pilot is now known as the Web Basic Pilot or E-Verify.

3   This primarily internet-based system reports the work authorization status of a new hire to

4   an employer by checking records at the Social Security Administration (SSA) and

5   Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services

6   (USCIS).  When the system provides a tentative nonconfirmation, the employee has an

7   opportunity to contact SSA or USCIS, using instructions provided by the employer, to

8   clear up his records.  If the employee is successful, the E-Verify databases are updated.  If

9   the employee fails to contest the nonconfirmation or is unsuccessful in doing so, E-Verify

10  issues a final nonconfirmation to the employer, who must then terminate the employee or

11  face a presumption that it violated IRCA.  (Facts, Doc. # 148, Ex. 7, E-Verify

12  Memorandum of Understanding, Art. II § C ¶ 9, Art. III; Doc. # 152, Ex. 52, Findings of

13  the Web Basic Pilot Evaluation 11–15, Sept. 2007.)

14      In the December 7, 2007 order dismissing *Arizona Contractors I*, the court made

15  findings of fact regarding employers' costs to set-up and operate E-Verify.  With the

16  benefit of the most recent survey data on E-Verify published in September 2007, the court

17  now finds that the cost to employers is considerably less than previously determined.  The

18  average cost to set-up E-Verify is $125, with 85% of employers spending $100 or less.

19  The average annual operation cost is $728, with 75% of employers spending $100 or less

20  annually.  (Facts, Doc. # 152, Ex. 52 at 104.)  Though this is considerably less than the

21  modest expenses the court found in *Arizona Contractors I*, such costs of compliance are

22  still sufficient to provide Plaintiffs with standing.

23      Because E-Verify remains voluntary at the national level, the I-9 process is still the

24  main employment verification process used by employers.  However, the I-9 system has

25  been thoroughly defeated by document and identity fraud, allowing upwards of eleven

26  million unauthorized workers to gain employment in the United States labor force, with

27  the number increasing at about a half a million a year.  (Facts, Doc. # 149, Ex. 15 at 1–3.)

28

1    The Act, A.R.S. §§ 23-211 to 23-214, is a conscious attempt to address this

2    problem at the State level by imposing sanctions by "licensing and similar laws" upon

3    those who employ unauthorized aliens, as expressly permitted by IRCA.  Under the Act,

4    county attorneys may bring suit in the Superior Court of Arizona against employers for

5    intentionally or knowingly employing unauthorized aliens.  An employer found liable

6    faces possible suspension or revocation of its business licenses, and it can be ordered to

7    file quarterly reports of new hires and to file an affidavit that it has terminated all

8    unauthorized aliens.  A.R.S. § 23-212(F).

9    The Act adopts IRCA's definition of "unauthorized alien,"  A.R.S. § 23-211(8),

10    which means an alien who is not "lawfully admitted for permanent residence, or . . .

11    authorized to be so employed by [IRCA] or by the Attorney General," 8 U.S.C. §

12    1324a(h)(3).  The Act also relies on the federal determination of a person's immigration

13    status and employment authorization.  According to federal law, "[n]otwithstanding any

14    other provision of Federal, State, or local law," federal, state, and local government

15    entities may request from USCIS (formerly the INS) "information regarding the

16    immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a) and (b)

17    (2000) (enacted by IIRIRA § 642, 110 Stat. at 3009-707).  USCIS has an affirmative

18    obligation to provide "verification or status information" requested by state and local

19    entities "for any purpose authorized by law."  § 1373(c).

20    In responding to § 1373 requests, USCIS accesses the Verification Information

21    System, which is the same database that it uses to process E-Verify requests.  Privacy

22    Act: Verification Information System Records Notice, 72 Fed. Reg. 17,569 (Apr. 9,

23    2007).  DHS reports that routine uses of the database are to provide information to

24    "Federal, State, tribal, and local government agencies seeking to verify or determine the

25    citizenship or immigration status of any individual within the jurisdiction of the DHS as

26    authorized or required by law" and to "to enable [such] agencies to make decisions

27    concerning: (1) Determination of eligibility for a Federal, State, or local public benefit;

28

- 7 -

1    (2) issuance of a license or grant; or (3) government-issued credential." *Id.* at 17,571–72.

2    USCIS also uses this system to respond to state requests to verify the citizenship and

3    immigration status of individuals seeking government benefits under the Systematic Alien

4    Verification for Entitlements (SAVE) program. *Id.* at 17,569.

5         The Act utilizes § 1373 to obtain a person's immigration and work authorization

6    status.  First, it states that when the attorney general and county attorneys investigate

7    complaints, they "shall not attempt to independently make a final determination on

8    whether an alien is authorized to work in the United States."  Rather, they must use §

9    1373 to verify the alien's "immigration status or work authorization status" with USCIS.

10   A.R.S. § 23-212(B).  Second, when the county attorney brings a case, the Superior Court

11   proceeds as follows:

> On determining whether an employee is an unauthorized alien, the court
> shall consider only the federal government's determination pursuant to 8
> United States Code section 1373(c). The federal government's
> determination creates a rebuttable presumption of the employee's lawful
> status. The court may take judicial notice of the federal government's
> determination and may request the federal government to provide
> automated or testimonial verification pursuant to 8 United States Code
> section 1373(c).

A.R.S. § 23-212(H).  In a separate section, the Act also requires that after December 31,

2007, "every employer, after hiring an employee, shall verify the employment eligibility

of the employee through the basic pilot program."  A.R.S. § 23-214.

### C.    Burden in a Facial Challenge

Plaintiffs "face a heavy burden in seeking to have [the Act] invalidated as facially

unconstitutional."  *Rust v. Sullivan*, 500 U.S. 173, 183 (1991).  "A facial challenge to a

legislative Act is, of course, the most difficult challenge to mount successfully, since the

challenger must establish that no set of circumstances exists under which the Act would

be valid."  *Engine Mfrs. Ass'n v. S. Coast Air Quality Maint. Dist.*, 498 F.3d 1031, 1048

(9th Cir. 2007) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  "The fact

that the regulations might operate unconstitutionally under some conceivable set of

- 8 -

1   circumstances is insufficient to render them wholly invalid." *Rust*, 500 U.S. at 183

2   (quoting *Salerno*, 481 U.S. at 745).

3   **II.    Federal Preemption Standards**

4           "[U]nder our federal system, the States possess sovereignty concurrent with that of

5   the Federal Government, subject only to limitations imposed by the Supremacy Clause [of

6   the United States Constitution]." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).  The

7   Supremacy Clause gives Congress the power to exclude state legislation in a field as

8   Congress defines it, so long as Congress is acting within the powers granted it under the

9   Constitution.  However, where "federal law is said to bar state action in fields of

10  traditional state regulation, . . . [courts proceed] on the assumption that the historic police

11  powers of the States were not . . . superseded by the Federal Act unless that was the clear

12  and manifest purpose of Congress." *Cal. Div. of Labor Standards Enforcement v.*

13  *Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997) (quoting *N.Y. State Conference*

14  *of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).

15  Conversely, "an 'assumption' of nonpre-emption is not triggered when the State regulates

16  in an area where there has been a history of significant federal presence." *United States v.*

17  *Locke*, 529 U.S. 89, 108 (2000).  The intent of Congress is the "touchstone" of any

18  preemption analysis.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963).

19          Federal preemption can be either "explicitly stated in [a] statute's language or

20  implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Waste Mgmt.*

21  *Ass'n*, 505 U.S. 88, 98 (1992) (plurality opinion) (citations omitted).  Where Congress has

22  explicitly provided that federal law is to be exclusive in a given field, states cannot

23  regulate in that field, even if their efforts complement or further federal objectives. *See,*

24  *e.g.*, *Morales v. TWA*, 504 U.S. 374, 387 (1992) (stating that an express preemption

25  provision may displace "all state laws that fall within its sphere, even including state laws

26  that are consistent with [the federal law's] substantive requirements.").  Congress also has

27  preempted an entire field where federal law is "so pervasive as to make reasonable the

28                                          - 9 -

1   inference that Congress left no room for the States to supplement it." *Gade*, 505 U.S. at

2   98 (citations omitted).

3   Where Congress has enacted federal law on a given subject, but evinces no express

4   or implied intention to preempt the field, states retain the power to regulate in the area

5   concurrently with the federal government.  Any regulation enacted by the states must not,

6   however, conflict with federal law.  A state law conflicts with federal law "where

7   compliance with both federal and state regulations is a physical impossibility, or where

8   state law stands as an obstacle to the accomplishment and execution of the full purposes

9   and objectives of Congress."  *Id.*  (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

10  The conflict posed must be more than "hypothetical" or "potential"; rather, the state

11  statute must have an effect that "actually" and "irreconcilably" conflicts with Congress'

12  intent.  *English v. General Elec. Co.*, 496 U.S. 72, 79, 90 (1990); *Rice v. Norman*

13  *Williams Co.*, 458 U.S. 654, 659 (1982).

14  **III.   The Immigration Reform and Control Act Expressly Authorizes, Rather**
    **Than Preempts, the Licensing Sanctions in the Act**

15  When Congress enacted IRCA, it expressly  preempted some state powers and

16  expressly preserved other state powers.  The task at hand is to "identify the domain

17  expressly preempted" by IRCA's language and give fair meaning to its savings clause for

18  state employment sanctions through licensing and similar laws.  *Air Conditioning &*

19  *Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th

20  Cir. 2005) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)).  "Since

21  pre-emption claims turn on Congress's intent, we begin as we do in any exercise of

22  statutory construction with the text of the provision in question, and move on, as need be,

23  to the structure and purpose of the Act in which it occurs."  *Id.* (quoting *Travelers Ins.*

24  *Co.*, 514 U.S. at 655).

25

26

27

28

1

### A.   The Plain Language of 8 U.S.C. § 1324a(h)(2) Authorizes State Licensing Sanctions

2

3

Section 1324a(h)(2) of Title 8, U.S.C., provides:

4

The provisions of this section [8 U.S.C. § 1324a] preempt any State or local law imposing civil or criminal sanctions (*other than through licensing and similar laws*) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

5

6   (Emphasis added.)  By this section, states may not impose "civil or criminal sanctions"

7   upon employers of unauthorized aliens, "other than through licensing and similar laws."

8   Therefore, if the Act constitutes a licensing or similar law, it is expressly authorized by

9   IRCA's savings clause.

10          The Act authorizes state courts to suspend or revoke the business licenses of

11   employers who knowingly or intentionally employ unauthorized aliens.  A.R.S. §

12   23-212(A) and (F).  By the terms of the Act, "license" means any state or local

13   "authorization that is required by law and that is issued . . . for the purposes of operating a

14   business in this state."  § 23-211(7)(a).  It includes articles of incorporation, a certificate

15   of partnership, a foreign corporation registration, and a transaction privilege (sales) tax

16   license, but not a professional license.  § 23-211(7)(b) and (c).  The Act's definition of

17   license does not depart from common sense or traditional understandings of what is a

18   license.  A license is a "permission, usually revocable, to commit some act that would

19   otherwise be unlawful."  BLACK'S LAW DISCTIONARY 938 (8th ed. 2004).  The Act is a

20   "licensing law" because it sets out criteria and a process to suspend or revoke a

21   permission to do business in the state.  It therefore falls within the plain meaning of

22   IRCA's savings clause.

23          Plaintiffs argue that Congress intended a narrow construction of licensing laws,

24   concerned only with a person's fitness to receive a license.  This construction ignores that

25   licenses are revokable, so states must have the power to create revocation criteria and

26   procedures.   Plaintiffs would also have the Act invalidated because its definition of

27   license reaches some legal instruments that allegedly do not supply permission to do

28

1   business in the state.  Even if this were the case, the Act is not facially invalid if its

2   definition sometimes exceeds the savings clause for "licensing laws."  Plaintiffs are free

3   to raise this defense if and when the State applies its law to revoke a legal instrument that

4   falls outside of the definition of "license."

**B.      The Licensing Sanction Authorization is Not Conditioned on Completed Federal Proceedings Against the Violator; the Legislative History Does Not So State and Could Not Defeat the Statutory Language if it Did**

Plaintiffs contend that the § 1324a(h)(2) authorization of state licensing sanctions

allows sanctions only on employers who already have been found liable in completed

federal proceedings under IRCA.  Plaintiffs base their argument on a sentence in the

House Judiciary Committee Report on IRCA.  H.R. Rep. No. 99-682(I), at 58 (1986),

*reprinted in* 1986 U.S.C.C.A.N. 5649, 5662.  The legislative history does not substantiate

Plaintiffs' interpretation, but even if it did, it could not change or add words to the statute.

The language of the statute that Congress approved, not language from the House

Report concerning the statute, controls.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545

U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the

legislative history."); *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 150 n.4

(2002) (describing House Report No. 99-682 as a "single Committee Report from one

House of a politically divided Congress" and noting that the dissent's reliance on the

report "is a rather slender reed"); *Sprietsma v. Mercury Marine,* 537 U.S. 51, 62–63

(2002) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)) (asserting

that express preemption analysis focuses on the plain wording of the statute, "which

necessarily contains the best evidence of Congress' pre-emptive intent.").  IRCA's

savings clause does not contain any language indicating that prior federal enforcement

action is necessary before a state may sanction an employer's license.  Plaintiffs'

interpretation would reduce the express authorization of state "licensing and similar laws"

almost to nothing, in contravention of the plain language of the statute.

- 12 -

1    In any event, the legislative history, and the House Report in particular, do not

2    compel the meaning Plaintiffs urge.  After the *De Canas* decision, Congressional bills

3    calling for federal employer sanctions began to contain preemption clauses for the first

4    time.  *See, e.g.*, S. 2252, 95th Cong. § 5 (1976); H.R. 9531, 95th Cong. § 5 (1976).  None

5    passed.  In following sessions of Congress, bills were introduced that included

6    preemption clauses similar to those of the 95th Congress.  *See* S. 1765, 97th Cong.

7    (1981); H.R. 4832, 97th Cong. (1981); S. 2222, 97th Cong. (1982); H.R. 5872, 97th

8    Cong. (1982); S. 529, 98th Cong. (1983); H.R. 1510, 98th Cong. (1983).  Again, none

9    passed.

10    However, in the 99th Congress, S. 1200 and H.R. 3810 contained preemption

11    clauses that for the first time included the exception "other than through licensing and

12    similar laws."  Unlike the earlier bills, S. 1200 was enacted and became the Immigration

13    Reform and Control Act of 1986.  The Senate Judiciary Committee Report on S. 1200,

14    dated August 25, 1985, did not comment on the express authorization of state licensing

15    and similar laws, and the Senate passed the bill on September 19, 1985.  *See* S. Rep. No.

16    99-132 (1985).  One of four House Committee Reports on H.R. 3810, however, the

17    House Judiciary Committee Report dated July 16, 1986, did comment on the licensing

18    exception to preemption:

19    > The penalties contained in this legislation are intended to specifically
20    > preempt any state or local laws providing civil fines and/or criminal sanctions
> on the hiring, recruitment or referral of undocumented aliens.

21    > They are not intended to preempt or prevent lawful state or local
22    > processes concerning the suspension, revocation or refusal to reissue a license
> to any person who has been found to have violated the sanctions provisions in
> this legislation. Further, the Committee does not intend to preempt licensing
23    > or "fitness to do business laws," such as state farm labor contractor laws or
> forestry laws, which specifically require such licensee or contractor to refrain
24    > from hiring, recruiting or referring undocumented aliens.

25    H.R. Rep. No. 99-682(I), at 58 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5662

26    ("House Report").  The conference committee report said nothing about preemption.  *See*

27    H. Conf. Rep. No. 99-1000 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5840.  Therefore,

28

1    whatever the meaning of the House Judiciary Committee Report's comment, it was not

2    before the Senate when it approved the bill.

3          The text of the House Report also does not support Plaintiffs' argument.  Their

4    interpretation overlooks the first quoted sentence, which paraphrases the bill as

5    preempting only state "civil fines" and "criminal sanctions."  The Arizona Act imposes

6    no fines or criminal sanctions.  Plaintiffs rely on the second quoted sentence, which no

7    doubt correctly states that state licensing processes are not preempted as to "any person

8    who has been found to have violated the sanctions provisions of this legislation."  But

9    Plaintiffs go further and assert that the example given in that sentence exhausts the entire

10   meaning of the licensing sanction authorization.  The passage does not so state, and the

11   very next sentence gives further examples of permitted licensing and fitness to do

12   business laws that are not tied to completed federal proceedings.  One need look only to

13   the sentence after the one Plaintiffs rely upon to see that the House Report does not bear

14   the meaning they would give it.

15         Finally, if the House Report did mean what Plaintiffs contend, such an attempt to

16   override the plain language of the statute would be precisely the kind of excess that the

17   modern view of legislative history illegitimates.  The Members or their staff must write

18   amendments into the bill, not into the Report.

19   **C.   The Structure and Purpose of IRCA Do Not Support Plaintiffs'
          Restrictive Interpretation of the Savings Clause**

20

21         Congress expressly preempted some state powers and expressly affirmed other

     state powers when it passed IRCA.  "[A]n express definition of the pre-emptive reach of a

22   statute 'implies' — i. e., supports a reasonable inference — that Congress did not intend

23   to pre-empt other matters."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995).  *See*

24   *also Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002) (citing *Cipollone v. Liggett*

25   *Group, Inc.*, 505 U.S. 504, 517, 547 (1992)); *Lorillard Tobacco Co. v. Reilly*, 533 U.S.

26   525, 541 (2001) (plurality opinion).  Because IRCA contains both an express preemption

27

28                                         - 14 -

1    provision and a savings clause, Congress has defined the scope of its preemptive intent

2    with respect to laws prohibiting the employment of unauthorized aliens.  Plaintiffs

3    nevertheless urge that the structure and purpose of IRCA create an inference of field

4    preemption and require a narrow interpretation of the § 1324a(h)(2) savings clause, which

5    will deprive the states of all practical power.  For the sake of thoroughness, that

6    contention is now addressed.

7         Unlike interstate transportation, foreign affairs, and even immigration,

8    employment of unauthorized aliens is neither intrinsically nor historically an exclusive

9    concern of the federal government such "that the federal system will be assumed to

10   preclude enforcement of state laws on the same subject."  *Rice v. Santa Fe Elevator*

11   *Corp.*, 331 U.S. 218, 230 (1947).  To the contrary, the Supreme Court held in *De Canas*

12   *v. Bica*, 424 U.S. 351 (1976), that the states have strong local interests in prohibiting the

13   employment of unauthorized aliens.  In *De Canas*, a California statute prohibited

14   employers from hiring aliens who were not entitled to lawful residence in the United

15   States if the employment would adversely affect lawful resident workers.  The Supreme

16   Court held that federal law did not preempt California's law.  It stated that "the Court has

17   never held that every state enactment which in any way deals with aliens is a regulation of

18   immigration and thus per se pre-empted by [the federal government's] constitutional

19   power [to regulate immigration]."  The California law did not regulate immigration

20   because it did not determine "who should or should not be admitted into the country, and

21   the conditions under which a legal entrant may remain." *Id.* at 355.

22        The Court also found no implied field preemption because "States possess broad

23   authority under their police powers to regulate the employment relationship and protect

24   workers within the State."

25            [State attempts] to prohibit the knowing employment by . . . employers
         of persons not entitled to lawful residence in the United States, let alone to

26       work here, [are] *certainly within the mainstream of such police power*
         *regulation.* Employment of illegal aliens in times of high unemployment

27       deprives citizens and legally admitted aliens of jobs; acceptance by illegal

28                                    - 15 -

1

2

3

4

> aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions. These local problems are particularly acute . . . in light of the significant influx into [a border state] of illegal aliens from neighboring Mexico.

5

6

7

*Id.* at 356–57 (emphasis added).  The Court reiterated this conclusion several years later in *Plyler v. Doe*, 457 U.S. 202 (1982).  That case did not concern preemption, but the Court noted:

8

9

10

11

> Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns.

12

*Id.* at 228 n.23.

13

14

        **1.**      **IRCA Does Not Clearly Evidence Congressional Intent to Prevent States From Independently Revoking the Business Licenses of Those Who Knowingly Employ Unauthorized Aliens**

15

16

17

18

19

20

21

22

23

      Plaintiffs argue that in IRCA, passed after *De Canas,* Congress carefully balanced competing policy interests surrounding employer sanctions, including the tension among enforcement, the risk of increased discrimination, and employer burdens.  They say that Congress could not have intended to permit the State to revoke a business's license, a sanction they say is disproportionate to the direct federal sanctions.  They would restrict the states' power of licensing sanctions to the narrowest of limits—so narrow that it would lack deterrence and not be worth the cost of enforcement to the State.  Plaintiffs cite no case holding that Congress impliedly so cabined the states' residual police powers in this area of great and pervasive local import.

24

25

26

27

      Plaintiffs do point to the Supreme Court's statement in *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*—a case that did not involve federal preemption—that IRCA is a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," through which the federal government "'forcefully' made combating the

28

1    employment of illegal aliens central to 'the policy of immigration law.'"  535 U.S. 137,

2    147 (2002) (quoting another non-preemption case, *INS v. National Center for*

3    *Immigrants' Rights, Inc.*, 502 U.S. 183, 194 n.8 (1991)).  That statement did not find an

4    intent to displace state police power over employers of unauthorized aliens, and

5    Congressional intent is the touchstone of field preemption analysis.  *Retail Clerks Int'l*

6    *Ass'n*, 375 U.S. at 103.  The Court's holding in *Hoffman* did not overrule its prior

7    decision in *De Canas* or contradict its statement in *Plyler*.

8         Plaintiffs also argue that courts should "decline to give broad effect to saving

9    clauses where doing so would upset the careful regulatory scheme established by federal

10   law."  *Locke*, 529 U.S. at 106 (citations omitted).  *See also Geier v. Am. Honda Motor*

11   *Co.*, 529 U.S. 861, 870 (2000) (quoting *Locke*, 529 U.S. at 106).  The cases cited by the

12   Supreme Court in these two opinions, *American Telephone & Telegraph Co. v. Central*

13   *Office Telephone, Inc.*, 524 U.S. 214, 227–28 (1998), and *Morales  v. Trans World*

14   *Airlines, Inc.*, 504 U.S. 374, 385 (1992), simply state that a savings clause cannot be

15   interpreted to defeat the central purpose of a statute's express provisions.  Plaintiffs

16   understand the Court's restatement of that principle in *Locke* and *Geier* as creating a

17   universal rule that whenever a savings clause appears in a carefully balanced federal

18   statute, the savings clause must be minimized, no matter the effect on, or the magnitude

19   of, state police powers.  No such rule can be derived from those cases.

20        *Locke* concerned Washington State rules that imposed "tanker design, equipment,

21   reporting, and operating requirements" aimed at preventing oil spills by interstate carriers.

22   529 U.S. at 97.  In the federal Oil Pollution Act, Congress included a savings clause

23   preserving state authority to impose "additional liability or requirements" pertaining to

24   "the discharge of oil or other pollution by oil within [a] state."  *Id.* at 104–05.

25   Nevertheless, the Court held that the state law was "in an area where the federal interest

26   has been manifest since the beginning of our Republic," that is, "[t]he authority of

27

28                                              - 17 -

1    Congress to regulate interstate navigation, without embarrassment from intervention of

2    the separate States and resulting difficulties with foreign nations." *Id.* at 99.

3         It construed the savings clause to "respect[] the established federal-state balance in

4    matters of maritime commerce between the subjects as to which the States retain

5    concurrent powers and those over which the federal authority displaces state control." *Id.*

6    at 107.  It recognized that states have "residual powers" that are appropriately "exercised

7    in concurrence with those of the national government." *Id.* at 109 (citing *McCulloch v.*

8    *Maryland*, 17 U.S. 316, 4 Wheat. 316, 4 L. Ed. 579 (1819)).  However, since states

9    historically and by recent precedent had little or no "residual powers" over interstate

10   vessel operation, design, or manning, it was "quite unlikely that Congress would use a

11   means so indirect as the savings clauses in [the statute] to upset the settled division of

12   authority." *Id.* at 106.  The Court therefore interpreted the Act to prohibit state regulation

13   of vessel operation, design, or manning, but to permit state laws concerning liability and

14   compensation from oil pollution.  *See also Geier*, 529 U.S. at 868 (interpreting the literal

15   language of an express preemption provision with a savings clause to "leav[e] adequate

16   room for state tort law to operate," but not to foreclose the finding of a conflict with

17   federal law).

18        When Congress enacted employer sanctions in IRCA, it acted "within the

19   mainstream of [state] police power regulation." *De Canas*, 424 U.S. at 356.  The

20   preemption analysis therefore "proceeds on the assumption that the historic police powers

21   of the States were not . . . superseded by the Federal Act unless that was the clear and

22   manifest purpose of Congress." *Dillingham Constr.*, 519 U.S. at 325.  "This presumption

23   against preemption leads us to the principle that express preemption statutory provisions

24   should be given a narrow interpretation." *Air Conditioning & Refrigeration Inst.*, 410

25   F.3d at 495.  Furthermore, its savings clause should be interpreted to "respect[] the

26   established federal-state balance . . . between the subjects as to which the States retain

27

28                                    - 18 -

1    concurrent powers and those over which the federal authority displaces state control."

2    *Locke*, 529 U.S. at 107; *Geier*, 529 U.S. at 868.

3           In enacting IRCA, Congress was distinctly aware of the localized impacts of

4    unauthorized immigration.  It included provisions to reimburse states for the costs of

5    incarcerating illegal aliens, IRCA § 501, 100 Stat. at 3443, and for the health, welfare,

6    education, and other costs imposed upon states by its legalization of unauthorized aliens

7    then in the country.  § 204, 100 Stat. at 3405–11.  Unlike IRCA's temporary worker

8    program provisions, which "preempt *any* State or local law regulating admissibility of

9    nonimmigrant workers," § 216 (h)(2), 110 Stat. at 3416 (emphasis added), Congress

10   passed employer sanctions provisions that expressly preempt only some state power and

11   expressly preserve other state powers.  It allowed complementary enforcement by states

12   through "licensing and similar laws."  8 U.S.C. § 1324a(h)(2).

13          If the authorized state and federal sanctions are disproportional in severity, that is

14   because Congress recognized the disproportional harm to core state and federal

15   responsibilities from unauthorized alien labor.  The pervasive adverse effects of such

16   employment fall directly on the states.  *De Canas*, 424 U.S. at 356–57; *Plyler*, 457 U.S. at

17   228 n.3.  *See also* Peter H. Schuck, *Taking Immigration Federalism Seriously*, 2007 U.

18   CHI. LEGAL F. 57, 79–80 (2007) ("The concentration of the undocumented in a small

19   number of states . . . means that the adverse political and fiscal effects of these

20   concentrations are disproportionate in these states."). Congress conspicuously did not take

21   responsibility for those costs.  In light of the disproportionate responsibilities and burdens

22   on the states, Congress could reasonably conclude that states are better equipped than

23   Congress to judge which licenses to sanction, and how much.  It left the strong deterrence

24   of licensing sanctions to individual states to implement in their own circumstances.

25          Thus, Congress expressly reserved to the states the police power described in *De*

26   *Canas* to act upon the business licenses of those who knowingly employ unauthorized

27   aliens.  At the time of *De Canas*, and therefore also today, that power included the power

28                                              - 19 -

to revoke such a license.   Preservation of that state power was itself part of Congress' careful balancing of policy objectives.  The structure and purpose of IRCA do not clearly evidence an intent to prevent the states from independently revoking the business licenses of those who knowingly employ unauthorized aliens.

### 2.    The Act Does Not Impermissibly Regulate in the Field of Immigration

Plaintiffs argue that the Act intrudes into the federal government's plenary power over the field of immigration.  *See Hines*, 312 U.S. at 66.  Neither A.R.S. § 23-214's requirement that all employers in the State use E-Verify, nor the licensing sanction provisions of section § 23-212 regulate immigration.  Like the California law at issue in *De Canas*, the Act does not determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *De Canas*, 424 U.S. at 355.  It "adopt[s] federal standards in imposing . . . sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country."   424 U.S. at 355.  "The State may borrow the federal classification" provided "that the classification is reasonably adapted to '*the purposes for which the state desires to use it*.'" *Plyler*, 457 U.S. at 226 (quoting *Oyama v. California*, 332 U.S. 633, 664–665 (1948).

The Act adopts the federal government's substantive classification of aliens, which appears in IRCA's definition of "unauthorized alien."  8 U.S.C. 1324a(h)(3); A.R.S. § 23-211(8).  Under that definition, all aliens who are not permanent residents or authorized to work by IRCA's legalization and temporary worker provisions already have been classified as "unauthorized aliens."  The Act's E-Verify requirement simply designates the procedure for verifying the existing classification of a person.  E-Verify and I-9 are "*employment* verification system[s]" that Congress created to operate within the context of employer sanctions laws.  8 U.S.C. § 1324a(b) (emphasis added); IIRIRA § 401(a), 100 Stat. at 3009-655 (establishing "pilot programs of employment eligibility

1   confirmation").  They do not substantively classify persons as work authorized.  Aliens

2   do not gain, lose, or change their status in the United States when they are processed

3   through E-Verify.  The Act's E-Verify requirement is therefore a regulation of

4   employment, not immigration.[1]

5         The sanctions provisions of A.R.S. § 23-212 also regulate only licensing and

6   employment.  According to that section, State enforcement officials and State courts must

7   request and rely exclusively on the federal determination of "immigration status or work

8   authorization status" provided by USCIS under 8 U.S.C. § 1373.  A.R.S. § 23-212(B),

9   (H).  Plaintiffs are mistaken that the only way to verify whether an alien is unauthorized

10  is through a federal deportation hearing.  Rather, the federal government allows the states

11  to verify a person's immigration status in relation to work authorization using § 1373.

12  *See* Privacy Act: Verification Information System Records Notice, 72 Fed. Reg. 17,569,

13  17,571–72 (Apr. 9, 2007) (describing USCIS's use of the same database to process

14  immigration status requests from state agencies and E-Verify).  The Act therefore validly

15  "adopt[s] federal standards in imposing . . . sanctions against state employers."  *De*

16  *Canas*, 424 U.S. at 355.

17  **IV.    The Act Does Not Conflict With the Purposes and Objectives of Congress**

18        As noted above, conflict preemption exists when "compliance with both State and

19  federal law is impossible, or when the state law 'stands as an obstacle to the

20  accomplishment and execution of the full purposes and objectives of Congress.'"  *Gade*,

21  505 U.S. 98 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Conflict preemption in

22  this case turns on the second form of conflict, where state law "stands as an obstacle" to

23

24  _____

25     [1] If the E-Verify requirement of A.R.S. § 23-214 were invalid, it would be severed
    and the remainder of the Act upheld.  2007 Ariz. Sess. Laws, Ch. 279, Sec. 5 ("If any

26  provision of this act or its application to any person or circumstance is held invalid, the
    invalidity does not affect other provisions of this act that can be given effect without the

27  invalid provision or application, and to this end the provisions of this act are severable.").

28

1   federal law.  This form of conflict is difficult to define and apply in a judicially prudent

2   manner, for "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by

3   examining the federal statute as a whole and identifying its purpose and intended effects."

4   *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373.[2]  As Justice Kennedy

5   explained in his precedential concurring opinion in *Gade*, where he cast the decisive vote,

6   "A freewheeling judicial inquiry into whether a state statute is in tension with federal

7   objectives would undercut the principle that it is Congress rather than the courts that

8   pre-empts state law."  505 U.S. at 110 (Kennedy, J., concurring).

9        That is why the Court has emphasized that conflict preemption arises only when

10  the federal and state laws "actually conflict."  *English*, 496 U.S. at 79.  *See also Sprietsma*

11  *v. Mercury Marine*, 537 U.S. 51, 64 (2002); *Freightliner Corp. v. Myrick*, 514 U.S. 280,

12  287 (1995); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963).  A

13  mere difference between state and federal law is not conflict.  *Paul*, 373 U.S. at 141–46.

14  The conflict must be "irreconcilable."  *Rice v. Norman Williams Co.*, 458 U.S. 654, 659

15  (1982).  "The teaching of [the Supreme Court's] decisions . . . enjoins seeking out

16  conflicts between state and federal regulation where none clearly exists."  *English*, 496

17

18  _____

19        [2]  The Supreme Court has observed that its "pre-emption categories are not 'rigidly distinct'" but that the pre-emptive label chosen can "*carry with it substantive implications for the scope of pre-emption*."  *Gade*, 505 U.S. at 104 n.2 (quoting *English*, 496 U.S. at 79 n.5) (emphasis added).  *See also Crosby*, 530 U.S. at 372 n.6.  The occasional conflation of implied field preemption and implied conflict preemption can be especially troubling.  *See Gade*, 505 U.S. at 115–16 (Souter, J., dissenting) (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW 486 (2d ed. 1988) (noting that some conflict preemption analysis presents 'a situation similar in practical effect to that of federal occupation of a field.'")).  Both require analysis of the structure and purpose of a statute to glean Congress' intent, but the substantive implication is different.  With field preemption, state police powers are relegated to the narrowest of limits.  With conflict preemption, states retain their police powers in full, but they cannot use those powers to defeat federal objectives.  Conflict preemption analysis, if loosely used, can allow invalidation of state laws based upon concerns that more properly go to field preemption, but without having to say straightly that states are excluded from the entire field.

U.S. at 90.  Those "decisions establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act . . . . [Conflict] pre-emption should be limited to state laws which impose prohibitions or obligations which are in direct contradiction to Congress' primary objectives, as conveyed with clarity in the federal legislation."  *Gade*, 505 U.S. at 110 (Kennedy, J., concurring).

> ### A.   The Act's Licensing Sanctions Procedures Do Not Conflict With the Purposes and Objectives of Congress

The licensing sanctions provisions of § 23-212 carefully track the federal employer sanctions law.  The Act does not make employers conform to a stricter standard of conduct than federal law.  Both the Act and IRCA prohibit employers from "knowingly" employing an unauthorized alien.  *Compare* A.R.S. § 23-212(A) *with* 8 U.S.C. § 1324a(a)(1)(A).  The Act also sanctions employers who "intentionally" employ unauthorized aliens, but "intentional" is at least as strict a standard as "knowing."  Also like IRCA, the Act's restrictions apply only with respect to those persons who have an "employment relationship" with an employer, so it does not include casual hires.  *Compare* A.R.S. § 23-211(3) *with* 8 U.S.C. § 1324a(a).  Nor would it include domestic workers because a business license is not needed to hire those persons.

Just like the federal law, the Act contains procedures for weeding out frivolous complaints and provides enforcement officers with discretion.  *Compare* A.R.S. § 23-212(C) *with* 8 U.S.C. § 1324a(e).  It does not change the degree of inspection that employers must perform on I-9 documents, but rather accords employers who have "complied in good faith" with the I-9 system with the same "affirmative defense" that is provided by federal law.  *Compare* A.R.S. § 23-212(J) *with* 8 U.S.C. § 1324a(a)(3).[3]

---

[3]  The Act's replication of the federal affirmative defense of I-9 compliance is not prohibited by 8 U.S.C. § 1324a(b)(4) and (5).  These provisions protect persons' privacy rights from employer misuse, and ensure that the government cannot expand use of the I-9 Form to prosecutions other than for employment of unauthorized aliens.  Arizona's replication of the federal affirmative defense respects those policies.  Subparagraph (4)

1    Also like IRCA, the Act accords employers who verify a new hire's employment

2    eligibility through E-Verify with a "rebuttable presumption" of non-liability.  *Compare*

3    A.R.S. § 23-212(I) *with* IIRIRA § 402(b), 110 Stat. at 3009-656.

4           The Act's adjudicatory procedures do not conflict with federal law merely because

5    a State Superior Court judge and a federal administrative law judge could disagree about

6    the evidence.  That possibility arises in every instance of parallel state and federal

7    adjudication.  Furthermore, the Act precludes liability for employers whose employees

8    are authorized to work in the United States according to the federal government.  The Act

9    requires State investigators to request a federal determination of a person's immigration

10   status.  When USCIS determines that an employee is authorized to work, State

11   investigators and courts must accept that determination and the employer cannot be liable.

12   A.R.S. §§ 23-211(8),  23-212 (B), (H).  *See League of United Latin Am. Citizens v.*

13   *Wilson*, 908 F. Supp. 755, 770 (C.D. Cal. 1995) (upholding the state's ability to "verify

14   immigration status by referring to INS information").  Any burden this imposes on the

15   federal agency is authorized by federal law, which states that USCIS "shall respond" to a

16   request for "verification or status information" "for any purpose authorized by law."  8

17   U.S.C. § 1373(c).

18          Plaintiffs argue that because the Act does not contain an explicit prohibition on

19   discrimination, it conflicts with federal law.  Arizonans are protected by the prohibitions

20

21   ─────────────────────

22   restricts employers from using copies of identification documents presented by new hires for
     any purpose other than "complying with the requirements of this subsection."  The

23   subsection creates IRCA's employment verification system.  The Act allows employers to
     use I-9 documentation to prove their compliance with the federal employment verification

24   system and then accords employers a rebuttable presumption of innocence.  Subparagraph
     (5) restricts I-9 Forms from being used "for purposes other than for enforcement of [IRCA]."

25   IRCA expressly includes state permission to impose sanctions on employers of unauthorized
     aliens through "licensing and similar laws."  8 U.S.C. 1324a(h)(2).  State use of I-9 Forms

26   to enforce employer licensing sanctions is therefore incorporated into subparagraph (5) by
     section (h)(2).

27

28                                            - 24 -

1    against discrimination in IRCA, other federal laws, and Arizona law.  *See* 8 U.S.C. §

2    1324b (prohibiting discrimination "against any individual . . . with respect to the hiring . .

3    . or the discharging of the individual from employment"); 42 U.S.C. § 2000e-2

4    (prohibiting discrimination based on "race, color, religion, sex, or national origin");

5    A.R.S. § 41-1463(B) (prohibiting employment discrimination based on "race, color,

6    religion, sex, age, disability or national origin").  The State did not have to duplicate these

7    laws by inserting an independent discrimination provision into the Act.  It provided that

8    the Act "shall not be construed to require an employer to take any action that the

9    employer believes in good faith would violate federal or state law."  A.R.S. § 23-213.

10    There is no actual conflict with the federal goal of discouraging discrimination because

11    the Act prohibits discrimination through deference to State and federal protections.

12        Plaintiffs also contend that the Act's threat of license revocation upsets the balance

13    that Congress struck between deterring employment of unauthorized aliens and

14    minimizing discrimination.  This false dichotomy amounts to an assertion that the Act

15    defeats Congress' objectives because it achieves better deterrence than IRCA.  Congress

16    did not intend that the price of avoiding discrimination would be ineffective deterrence.

17    Instead, it made discrimination illegal, imposed its own sanctions, and affirmed states'

18    power to impose licensing sanctions.

19        Plaintiffs rely upon two foreign relations cases to argue that a slight shift in the

20    mix of enforcement and discrimination creates a conflict.  In *Crosby v. National Foreign*

21    *Trade Council*, the Supreme Court held that states could not upset "the federal decision

22    about the right degree of pressure to employ" and "undermine[] the congressional

23    calibration of force" by "penalizing individuals and conduct that Congress . . . explicitly

24    exempted or excluded from [trade] sanctions," especially "when the President exercises

25    his discretionary authority to impose sanctions under the federal Act."  530 U.S. 363,

26    378–380 (2000).  Likewise, the Supreme Court held in *American Ins. Ass'n v.*

27    *Garamendi*, that "the state Act [cannot] stand[] in the way of the President's diplomatic

28                                             - 25 -

objectives" by requiring public disclosure of dealings in Europe during the Holocaust that did not have to be disclosed under federal rules, and thereby "use an iron fist where the President has consistently chosen kid gloves."  539 U.S. 396, 427 (2003) (quoting *Crosby*, 530 U.S. at 386) (alterations omitted).

Unlike the state laws in *Crosby* and *Garamendi*, the Act does not authorize sanctioning employers for acts that Congress has exempted or excluded from sanction. The sanctioned activity under IRCA and the Act is exactly the same.  Furthermore, *Crosby* and *Garamendi* dealt with foreign relations, where the federal interest is dominant and therefore "any concurrent state power that may exist . . . is restricted to the narrowest of limits."  *Hines*, 312 U.S. at 68.  In contrast, the Act's employer sanctions provisions are employment regulations that are squarely within the police power of the State and that mirror those of IRCA in every significant respect.  They do not conflict with the purposes and objectives of Congress.  *See* Schuck, *supra*, at 80 ("[I]t is hard to see how state employer sanctions provisions that are carefully drafted to track the federal employer sanctions law can be inconsistent with it—unless we take ineffective enforcement to be the 'real' federal policy from which state law must not deviate.").

**B.    The Act's Requirement that Employers Use E-Verify Does Not Conflict With the Purposes and Objectives of Congress**

Because use of E-Verify is voluntary under federal law, Plaintiffs assert that the State's E-Verify requirement in § 23-214 is preempted.  "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Gade*, 505 U.S. at 98 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990)).  When Congress enacted IIRIRA, it declared that "the Attorney General may not require any person or other entity to participate in [E-Verify]." § 402(a), 110 Stat. at 3009-656.  This and every other provision in IIRIRA that mentions voluntary participation refers to how E-Verify is to operate in the context of the federal employer sanctions system.  Those provisions strongly evidence Congress' intent not to make E-

1  Verify mandatory at the national level for the national sanctions law.  Without more, they

2  do not raise an inference that Congress intended to prevent the states from mandating use

3  of the system in their licensing laws.

4  Congress wishes E-Verify to be used and revised through experimentation.  In

5  IRCA, it authorized the President to implement changes to the I-9 system "to establish a

6  secure system to determine employment eligibility." 8 U.S.C. § 1324a(d)(1).  Congress'

7  objective is to create a system that will reliably determine employment eligibility, will be

8  counterfeit-resistant, and will protect privacy rights. § 1324a(d)(2).  The system also

9  needs to "have reasonable safeguards against the system's resulting in unlawful

10  discriminatory practices."  IIRIRA § 404(d)(4), 110 Stat. at 3009-663.  But Congress has

11  not conditioned use of E-Verify on the perfect achievement of these goals.  It ordered the

12  Secretary of Homeland Security to make the program accessible nationwide despite its

13  alleged imperfection.  Expansion Act § 3(b), 117 Stat. at 1944.  Unless and until Congress

14  fails to re-authorize the program by November, 2008,[4] E-Verify is a Congressionally

15  approved tool for employers nationwide.

16  The Act's E-Verify requirement does not misuse federal resources for an

17  unintended purpose. *See Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D.

18  Cal. 2006) (holding that a local government could not misuse a system for ascertaining

19  benefits eligibility to verify eligibility for housing).  It requires employers to use E-Verify

20  for the precise purpose that Congress intended.  It also does not force the federal

21  government to allocate more resources to the program than Congress intended to allocate.

22  The Secretary of Homeland Security must accommodate employer enrollment to the

23  maximum extent that he deems possible given his budgetary and technical resources.  *See*

24

25  [4] The federal government may terminate an employer's use of E-Verify.  There is no reason to think that the government would exclude users except for their own misconduct.

26  Even if a user were terminated or E-Verify ceased to exist, the remainder of the Act could

27  be validly implemented and would survive.

28

1   IIRIRA § 402(c)(3), 110 Stat. at 3009-657 (the Secretary "shall accept all elections" of

2   employers to participate, but has the power to "reject an election [to participate] . . . if

3   [he] has determined that there are insufficient resources to provide appropriate

4   services."). There is no evidence that the Secretary, or any executive officer for that

5   matter, has balked at the number of E-Verify users that Arizona would add to the system.

6   Indeed, the court can take judicial notice that DHS has placed billboard and radio

7   advertisements in the Phoenix area to encourage greater participation.

8          The E-Verify requirement does not overburden employers with financial and

9   administrative costs.  The overwhelming majority of E-Verify users pay very little in set-

10   up and operational costs and find the system easier to use than I-9 alone.  Plaintiffs have

11   no evidence that Congress intended to protect employers from state laws that impose such

12   incremental costs.  Furthermore, unlike the regulation in *Geier v. American Honda Motor*

13   *Co.*, 529 U.S. 861 (2000), Congress did not intend to vest employers with individual

14   rights, good against the states' police powers, to choose whether or not to participate in E-

15   Verify.  In *Geier*, the Department of Transportation faced public discontent over its

16   mandate that car manufacturers use particular passive restraint systems, so it issued a

17   regulation that "deliberately sought variety — a mix of several different passive restraint

18   systems."  It contemporaneously explained that allowing manufacturers to choose would

19   avoid another "backlash" and "facilitate the development of alternative, cheaper, and

20   safer restraint systems."  *Id.* at 876–79.  Here, plaintiffs have no evidence that Congress

21   intended to vest employers with an autonomous choice for the sake of a higher federal

22   goal.

23          Federal policy encourages the utmost use of E-Verify.  The Act effectively

24   increases employer use of the system with no evidence of surpassing logistical limits, and

25   it does so in the context of a licensing sanction law that is within the police power of the

26   states as expressly recognized by IRCA.  That Congress has not yet approved a bill

27   mandating use of E-Verify within the federal employer sanctions process evinces

28                                          - 28 -

1    Congressional intent regarding national—not state level—use of E-Verify.  The Act's

2    requirement that Arizona employers use E-Verify therefore does not actually conflict with

3    Congress' objectives.

4    **V.     The Act Provides Employers With Procedural Due Process**

5           Under both the federal and State constitutions, procedural due process requires that

6    a party have an opportunity to be heard "at a meaningful time and in a meaningful

7    manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*,

8    380 U.S. 545, 552 (1965)).  Due process requires notice that is reasonably calculated

9    under all of the circumstances to apprise interested parties of the pendency of the action

10   and afford them the opportunity to present their objections.  *Mullane v. Cent. Hanover*

11   *Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  It also requires "a fair trial in a fair

12   tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955); *United States v. Superior Court*,

13   144 Ariz. 265, 280, 697 P.2d 658, 673 (1985).  Due process "is flexible and calls for such

14   procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334

15   (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

16          Plaintiffs contend that the Act on its face violates procedural due process of law by

17   denying employers any fair ascertainment of an essential element of liability.  Again, the

18   Act provides the following concerning Superior Court proceedings:

19               On determining whether an employee is an unauthorized alien, the court
                 shall consider only the federal government's determination pursuant to 8
20               United States Code section 1373(c).  The federal government's
                 determination creates a rebuttable presumption of the employee's lawful
21               status.  The court may take judicial notice of the federal government's
                 determination and may request the federal government to provide
22               automated or testimonial verification pursuant to  8 United States Code
                 section 1373(c).
23
24   A.R.S. § 21-212(H).  This subsection requires interpretation.  On the one hand, the

25   Superior Court "shall consider only" the federal government's determination "whether an

26   employee is an unauthorized alien."  But on the other hand, that determination only

27   creates "a rebuttable presumption," meaning that other evidence may be considered.  The

28                                              - 29 -

1   Superior Court itself may request "automated or testimonial verification" from the federal
2   government.

3          The parties offer different interpretations of this subsection.  Plaintiffs say that the
4   federal determination of the employee's authorization status is conclusive, and thus
5   denies employers any chance to present evidence that the employee is authorized.  They
6   give no effect to the second sentence, which subjects the federal determination to rebuttal
7   evidence.  Defendants' interpretation gives some effect to both sentences.  They interpret
8   the provision to preclude the State from enforcing the Act unless it has received federal
9   verification that the employee is unauthorized, but to allow the Superior Court to consider
10  all evidence on questions of liability.  Under either interpretation, an employer can
11  present evidence of the employee's immigration status or work authorization to prove he
12  lacked knowledge or intent to employ an unauthorized alien.

13         This court need not resolve which interpretation of the statute is correct.  For
14  Plaintiffs to prevail in this facial challenge, they must show there is no procedurally
15  adequate application of the statute.  They have not done that, as each of the offered
16  meanings of § 21-212(H) entails minimally fair procedure, or better.

17         **A.     Defendants' Interpretation Meets Due Process**

18         Defendants' interpretation of § 21-212(H) easily meets due process requirements.
19  No employer may be sanctioned without a full evidentiary hearing in the Superior Court
20  of Arizona.  A.R.S. § 23-212(E); Ariz. R. Civ. P. 65.2.  The State has the burden to prove
21  that the employer knowingly or intentionally employed an unauthorized alien.  The
22  Superior Court has full evidence-taking, fact-finding, and discretionary authority on all
23  issues of liability; it simply cannot find an employee unauthorized absent a federal
24  determination to that effect under 8 U.S.C. § 1373(c).

25         Under Defendants' interpretation, subsection (H) parallels subsection (B), which
26  prohibits enforcing officers from "independently making a final determination on whether
27  an alien is authorized to work in the United States" apart from the government's §

28                                          - 30 -

1    1373(c) response.  Subsections (B) and (H) harmonize the Act with federal law and may

2    be meant to protect workers from being the direct subject of investigation and

3    enforcement.  But where the employer's liability is at issue, the § 1373(c) determination

4    creates only a rebuttable presumption—meaning that the employer may present any

5    evidence to rebut the presumption that the employee is unauthorized or prove that it

6    lacked knowledge of the employee's unauthorized status.  Because the State cannot

7    conclude that the employee is unauthorized without the federal determination, additional

8    evidence of the employee's status can only exonerate the employer from liability.

9          This interpretation provides the employer with a meaningful hearing on the subject

10   of liability and avoids the constitutional issues posed by Plaintiffs.  *See Mejak v.*

11   *Granville*, 212 Ariz. 555, 557, 136 P.3d 874, 876 (2006) ("[I]n interpreting a statute, this

12   Court must . . . give effect to every provision in the statute . . . [and] interpret the statute

13   so that no provision is rendered meaningless, insignificant, or void."); *Business Realty v.*

14   *Maricopa County*, 181 Ariz. 551, 559, 892 P.2d 1340, 1349 (1995) ("We interpret

15   statutes to uphold their constitutionality, if that is possible.  As a corollary, we strive to

16   give statutes meanings that avoid serious constitutional issues. We reach those only when

17   absolutely necessary.").

18        **B.     Plaintiffs Have Not Shown That Their Interpretation Fails Due Process**

19         Even if the government's § 1373(c) response that the employee is unauthorized is

20   conclusive upon the Superior Court, as Plaintiffs contend, employers still have doubly fair

21   and adequate procedure embedded in the federal determination itself.  That fair procedure

22   is found in the E-Verify process, which Arizona employers must use, and again in the §

23   1373(c) response that the county attorney and the Superior Court may request from the

24   government.

25        1.     The E-Verify process itself is fair, prompt, interactive, and adequate. It

26   provides opportunity for the employee to be heard.  After an initial report to the employer

27   that the employee is not authorized to work, USCIS must make available  a "secondary

28                                          - 31 -

verification process to confirm the validity of information provided." IIRIRA § 404(c), 110 Stat. at 3009-663. USCIS records the result of both its initial response and its secondary verification process in the Verification Information System database, and then issues a final determination. (Facts, Doc. # 152, Ex. 52, Findings of the Web Basic Pilot Evaluation 11–15, Sept. 2007.) The employer is the beneficiary of that process, with the authorized employee having his federal records cleared up unless he abandons the effort. The employer is protected by his ability to terminate an employee who declines to clear up his records through the interactive process of E-Verify. An employee who proceeds to a final non-confirmation under E-Verify may even have federal judicial review of that final determination. *See* 5 U.S.C. § 702. When the State later submits its § 1373(c) request and USCIS checks its verification database, the data will reflect the outcome of the secondary process and the response given to the State will be a final determination of employment status.

With employers on notice that they must avail themselves of this prior adequate procedure, due process does not require a second procedure (though § 21-212(H) does give them a second procedure under 8 U.S.C. § 1373(c)). Due process of law does not prevent legislation from requiring recourse to prior adequate proceedings, the result of which may not be questioned in a later proceeding, such as an enforcement proceeding. *Natural Resources Defense Council, Inc. v. U.S. EPA*, 673 F.2d 400, 406–07 (D.C. Cir. 1982) (due process concerns arising from preclusion of review have little weight where, in fact, the regulated parties were on full notice of the need to challenge regulations within a specified time). The Act builds on this due process principle and thus accords employers and workers fair and adequate process. Obligatory deference to the procedurally adequate and mandatory federal determination process is not unconstitutional.

Of course, the procedural adequacy of E-Verify could count as a substitute for original Superior Court evidence and fact-finding concerning the employee's

1    unauthorized status only if the employer was on notice to use E-Verify when hiring the

2    worker.  That is not the case for workers who were hired before E-Verify became

3    mandatory in Arizona on January 1, 2008.  There is debate over whether the Act permits

4    enforcement proceedings concerning employees hired before January 1, 2008.  Though at

5    least some county attorneys say the Act does apply to previous hires, no county attorney

6    has expressed any intention of enforcing with respect to previous hires.  (Trial Tr. 109.)

7    The cost-of-compliance injury upon which the court has found standing against the

8    county attorneys would not apply to enforcement for previous hires since the Act does not

9    purport to require E-Verify confirmation for them.  In any event, the court need not

10   decide whether the Act permits enforcement for old hires, which would have to await an

11   actual case with those facts.  It is enough that the statute is capable of some constitutional

12   application to defeat this facial challenge.

13        2.     Employers who have not confirmed under E-Verify have one or two more

14   chances for secondary verification of the employee's status, thus affording adequate

15   procedure to the employer.  The first may occur when the State submits its request under

16   § 1373(c).  Second, the Superior Court may "request the federal government to provide

17   automated or testimonial verification pursuant to [§ 1373]," A.R.S. § 23-212(H), which

18   is another chance to submit evidence of the employee's work authorization and have the

19   government act upon it.  Under federal law, USCIS has an affirmative duty to respond to

20   such verification requests.  8 U.S.C. § 1373(c).

21        USCIS has not clearly defined many of the procedures that it follows when

22   responding to state § 1373(c) inquiries.  It might perform secondary verifications of

23   employee documentation at the behest of State investigators and the Superior Court.  The

24   number of such requests will be insignificant compared to the number of E-Verify

25   requests, so the agency easily could do so.  Arguable legal authority also exists for

26   secondary checks through § 1373 requests.  IIRIRA §§ 403(a)(4), 404(c), 642, 110 Stat.

27   3009-660, 661, 663, 707 (requiring the federal government to "provid[e] the *requested*

28                                              - 33 -

1    verification or status information" to the states in the same statute that created E-Verify

2    and mandated a secondary verification process) (emphasis added).  If USCIS performs

3    secondary verification of employee documentation, then its § 1373(c) process will be the

4    same as the E-Verify process.

5          Neither the federal government nor the flexible principles of due process explained

6    in *Mathews*, 424 U.S. at 334, require that the employer be allowed to interact directly

7    with the federal government agency in its verifying process.  Even under E-Verify,

8    Congress gave the employee access to the secondary verification process, not the

9    employer, though the employer must inform and assist the employee.  IIRIRA §

10   403(a)(4), 100 Stat. 3009-660 to 661.  (*See also* Facts, Doc. # 148, Ex. 7, E-Verify

11   Memorandum of Understanding, Art. II § C ¶ 9, Art. III.)

12         The Act provides employers opportunities to be heard through the federal

13   processes themselves.  They may be heard indirectly through their employees' dialog with

14   the government in E-Verify, and directly by presenting evidence of an employee's

15   immigration status, perhaps to the county attorney and certainly to the Superior Court.

16   Both can pass it on to the federal government for secondary review of work authorization

17   and a further determination under § 1373(c).  Plaintiffs' evidence does not prove that

18   USCIS will refuse to consider such evidence and conduct secondary review of the

19   employee's work authorization.  Therefore, even if the government's § 1373(c) response

20   is conclusive upon the Superior Court, Plaintiffs fall short of showing that the § 1373(c)

21   process itself will lack adequacy and fairness.  That is enough to defeat this facial

22   challenge.

23         The facial constitutionality of this process is not defeated by hypothetical

24   situations that may result in no secondary verification taking place.  Such abstraction is

25   not the business of a facial challenge.  Plaintiffs may raise those as-applied challenges if

26   and when such procedural failures occur.

27

28
                                    - 34 -

1

### C.     The Superior Court Process Is Fair and Adequate

2     Plaintiffs' other procedural due process challenges have no merit.  The other

3 Superior Court processes are subject to all the procedural protections of the Arizona

4 Rules of Civil Procedure.  Since the Superior Court has full evidence-taking, fact-finding,

5 and discretionary authority on these issues, with the burden of proof on the State, there

6 can be no due process right to participate in the enforcing officer's investigation and

7 preparation of his case (though civil enforcement proceedings are rarely brought without

8 first contacting the defendant).

9     Nowhere in the Act does it say that county attorneys must prosecute all non-

10 frivolous cases, or ones motivated by discrimination.  Plaintiffs' other procedural fears

11 are improbable.  If they ever arose in a real case, they could be decided, but there are no

12 real facts here and the Act is not deficient on its face.

13 **VI.     Other Contentions**

14     The Business Group Plaintiffs' complaint (Doc. # 1) also alleges that the Act

15 violates the Commerce Clause of the U.S. Constitution, the separation of powers doctrine

16 of the Arizona Constitution, and the Fourth Amendment of the U.S. Constitution.  They

17 have stipulated to withdraw the separation of powers and Fourth Amendment claims.

18 (Doc. # 134).

19     With respect to the Commerce Clause argument, the Act does not regulate

20 employees completely outside of the State.  The Act defines "employee" as "[a]ny person

21 who performs employment services for an employer" who is licensed to do business in

22 the State.  A.R.S. § 23-211(3).  However, enforcement actions must be filed "against the

23 employer by the county attorney *in the county where the unauthorized alien is employed*."

24 § 23-212(D) (emphasis added).  This precludes the extra-territorial application upon

25 which the Business Group Plaintiffs ground their Commerce Clause argument.  It also

26 precludes conflict with the laws of another state where an employee works.

27

28

1    IT IS THEREFORE ORDERED that the Clerk enter judgment dismissing these

2    actions as against Defendant Arizona Attorney General Terry Goddard without prejudice

3    for lack of subject matter jurisdiction, there being no justiciable case or controversy

4    against him.

5    IT IS FURTHER ORDERED as to all other Defendants that the Clerk enter

6    judgment against Plaintiffs and in favor of those Defendants and that Plaintiffs take

7    nothing.  The Clerk shall terminate this action.

8    IT IS FURTHER ORDERED that the motions for preliminary injunction (Doc. # 4

9    in No. CV 07-2496 and Doc. # 3 in No. CV 07-2518) are denied.

10    Dated: February 7, 2008.

11

12

13

14

15    _____

16    Neil V. Wake
      United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28
                                        - 36 -

1

**INDEX**

2    I.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3           A.    Procedural History and Related Proceedings   . . . . . . . . . . . . . . . . . . . . . 3

4           B.    State and Federal Sanctions for Employing Unauthorized Workers . . . . . . 4

5           C.    Burden in a Facial Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6    II.    Federal Preemption Standards   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7    III.   The Immigration Reform and Control Act Expressly Authorizes, Rather
            Than Preempts, the Licensing Sanctions in the Act . . . . . . . . . . . . . . . . . . . . 10
8
            A.    The Plain Language of 8 U.S.C. § 1324a(h)(2) Authorizes State
9                 Licensing Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10          B.    The Licensing Sanction Authorization is Not Conditioned on
                  Completed Federal Proceedings Against the Violator; the Legislative
11                History Does Not So State and Could Not Defeat the Statutory
                  Language if it Did . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
12
            C.    The Structure and Purpose of IRCA Do Not Support Plaintiffs'
13                Restrictive Interpretation of the Savings Clause . . . . . . . . . . . . . . . . . . . . 14

14                1.    IRCA Does Not Clearly Evidence Congressional Intent to
                        Prevent States From Independently Revoking the Business
15                      Licenses of Those Who Knowingly Employ Unauthorized
                        Aliens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
16
                  2.    The Act Does Not Impermissibly Regulate in the Field of
17                      Immigration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18   IV.    The Act Does Not Conflict With the Purposes and Objectives of Congress . . . . 21

19          A.    The Act's Licensing Sanctions Procedures Do Not Conflict With the
                  Purposes and Objectives of Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
20
            B.    The Act's Requirement that Employers Use E-Verify Does Not
21                Conflict With the Purposes and Objectives of Congress . . . . . . . . . . . . . . 26

22   V.     The Act Provides Employers With Procedural Due Process . . . . . . . . . . . . . . . . 29

23          A.    Defendants' Interpretation Meets Due Process . . . . . . . . . . . . . . . . . . . . . 30

24          B.    Plaintiffs Have Not Shown That Their Interpretation Fails Due
                  Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
25
            C.    The Superior Court Process Is Fair and Adequate . . . . . . . . . . . . . . . . . . 35
26
     VI.    Other Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
27
28