1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   ARIZONA CONTRACTORS                )   No. CV07-02496-PHX-NVW (lead)
    ASSOCIATION, INC., an Arizona non-  )   No. CV07-02518-PHX-NVW (member)
10  profit corporation; ARIZONA         )
    EMPLOYERS FOR IMMIGRATION           )   **ORDER**
11  REFORM, INC., an Arizona non-profit )
    corporation; CHAMBER OF             )
12  COMMERCE OF THE UNITED              )
    STATES OF AMERICA, a Washington     )
13  D.C. non-profit corporation; ARIZONA )
    CHAMBER OF COMMERCE, an             )
14  Arizona non-profit corporation;     )
    ARIZONA HISPANIC CHAMBER OF         )
15  COMMERCE, INC., an Arizona non-     )
    profit corporation; ARIZONA FARM    )
16  BUREAU FEDERATION, an Arizona       )
    non-profit corporation; ARIZONA     )
17  RESTAURANT AND HOSPITALITY          )
    ASSOCIATION, an Arizona non-profit  )
18  corporation; ASSOCIATED MINORITY    )
    CONTRACTORS OF AMERICA, an          )
19  Arizona non-profit limited liability )
    company; ARIZONA ROOFING            )
20  CONTRACTORS ASSOCIATION, an         )
    Arizona non-profit corporation;     )
21  NATIONAL ROOFING                    )
    CONTRACTORS' ASSOCIATION, an        )
22  Illinois not-for-profit corporation; )
    WAKE UP ARIZONA! INC., an           )
23  Arizona non-profit corporation; and )
    ARIZONA LANDSCAPE                   )
24  CONTRACTORS ASSOCIATION,            )
    INC., an Arizona non-profit corporation, )
25                                      )
                  Plaintiffs,           )
26                                      )
    vs.                                 )
27                                      )

28

1   CRISS CANDELARIA, Apache County )
    Attorney; ED RHEINHEIMER, Cochise )
2   County Attorney; TERENCE C.       )
    HANER, Coconino County Attorney;  )
3   DAISY FLORES, Gila County Attorney; )
    KENNY ANGLE, Graham County        )
4   Attorney; DEREK D. RAPIER, Greenlee )
    County Attorney; MARTIN BRANNAN, )
5   LaPaz County Attorney; ANDREW P.  )
    THOMAS, Maricopa County Attorney; )
6   MATTHEW J. SMITH, Mohave County )
    Attorney; JAMES CURRIER, Navajo   )
7   County Attorney; BARBARA          )
    LAWALL, Pima County Attorney;     )
8   JAMES P. WALSH, Pinal County      )
    Attorney; GEORGE SILVA, Santa Cruz )
9   County Attorney; SHEILA POLK,     )
    Yavapai County Attorney; JON SMITH, )
10  Yuma County Attorney; TERRY       )
    GODDARD, Attorney General of the  )
11  State of Arizona; and FIDELIS V.  )
    GARCIA, Director of the Arizona   )
12  Registrar of Contractors,         )
                                      )
13          Defendants.               )
    _____ )
14  VALLE DEL SOL, INC.; CHICANOS )
    POR LA CAUSA, INC.; and SOMOS )
15  AMERICA,                          )
                                      )
16          Plaintiffs,               )
                                      )
17  vs.                               )
                                      )
18                                    )
    TERRY   GODDARD,   in   his   official )
19  capacity as Attorney General of the State )
    of Arizona; GALE GARRIOTT, in his )
20  official capacity as the Director of the )
    Arizona Department of Revenue; and )
21  ANDREW  THOMAS,  in  his  official )
    capacity as Maricopa County Attorney, )
22                                    )
            Defendants.               )
23  _____ )

24          Plaintiffs have appealed the February 7, 2008 judgment dismissing Defendant

25  Arizona Attorney General Terry Goddard without prejudice for lack of subject matter

26  jurisdiction and entering judgment in favor of all other Defendants.  They now seek an

27  injunction preventing Defendants from implementing or enforcing the Legal Arizona

28
                                    - 2 -

1   Workers Act ("the Act"), A.R.S. §§ 23-211 through 214, for the duration of the appeal.

2   Fed. R. Civ. P. 62(c). (Doc. ## 181, 182, and 183.)  The court's findings of fact and

3   conclusions of law (Doc. # 175) principally concluded: (1) that the Act is not expressly

4   preempted by the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No.

5   99-603, 100 Stat. 3359 (employer sanctions provisions codified at 8 U.S.C. § 1324a to

6   1324c (2000)); (2) that the structure and purpose of IRCA do not clearly indicate

7   Congressional intent to occupy the field of licensing sanctions for employers of

8   unauthorized aliens; (3) that the Act does not regulate immigration; (4) that neither the

9   licensing sanctions provisions of A.R.S. § 23-212, nor the requirement to use E-Verify

10  found in A.R.S. § 23-214 conflicts with the purposes and objectives of Congress; (5) that

11  the Act affords employers due process of law; and (6) that the Act does not violate the

12  Commerce Clause of the U.S. Constitution.

13  **I.      Standards for Injunction Pending an Appeal**

14          An injunction pending appeal under Federal Rule of Civil Procedure 62(c) is an

15  extraordinary remedy that should be granted sparingly. *Reading & Bates Petroleum Co.*

16  *v. Musslewhite*, 14 F.3d 271, 275 (5th Cir. 1994) ("Stays pending appeal constitute

17  extraordinary relief."); *United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981)

18  ("Since such an action interrupts the ordinary process of judicial review and postpones

19  relief for the prevailing party at trial, the stay of an equitable order is an extraordinary

20  device which should be sparingly granted.").

21          Four factors must be considered on Rule 62(c) motions: "(1) whether the stay

22  applicant has made a strong showing that he is likely to succeed on the merits; (2)

23  whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the

24  stay will substantially injure the other parties interested in the proceeding; and (4) where

25  the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

26          In general, to prevail on a motion for injunction pending appeal, the moving party

27  must show either (1) "a strong likelihood of success on the merits" and "the possibility of

28                                                      - 3 -

1    irreparable injury to plaintiff if preliminary relief is not granted" or (2) "that serious legal

2    questions are raised and that the balance of hardships tips sharply in its favor." *Golden*

3    *Gate Restaurant Ass'n. v. City of San Francisco*, No. 07-17370, ___ F.3d ___, 2008 WL

4    90078, at *2, 2008 U.S. App. LEXIS 364, at *4 (9th Cir. Jan. 9, 2008) (quoting *Natural*

5    *Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007); *Lopez v. Heckler*,

6    713 F.2d 1432, 1435 (9th Cir. 1983)).  "These two formulations represent two points on a

7    sliding scale in which the required degree of irreparable harm increases as the probability

8    of success decreases."  *Winter*, 502 F.3d at 862.  Courts must "consider 'where the public

9    interest lies' separately from and in addition to" the balance of hardships between the

10   parties.  *Id.* at 863.

11           All laws passed by State legislatures are entitled to a presumption of validity.  That

12   presumption is an equity to be considered in favor of the State when balancing hardships.

13   *See Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984)

14   (Rehnquist, J., chambers).  For that reason, in cases "in which 'the moving party seeks to

15   stay governmental action taken in the public interest pursuant to a statutory or regulatory

16   scheme,' the injunction should be granted only if the moving party meets the more

17   rigorous likelihood-of-success standard."  *Bery v. City of New York*, 97 F.3d 689, 694 (2d

18   Cir. 1996) (citing *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989));

19   *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000).  *Cf. Golden Gate Restaurant Ass'n.*, 2008

20   WL 90078, at *13, 2008 U.S. App. LEXIS 364, at *37 (stating that to overcome the

21   public interest factor, it must be "obvious" that the law is invalid).

22           In this case an injunction is not needed to protect appellate jurisdiction and would

23   upset the status quo.

24   **II.    Plaintiffs are Unlikely to Succeed in Invalidating the Act**

25           Plaintiffs bear a heavy burden to invalidate the Act on appeal.  They challenge the

26   Act on its face, so they must prove that the Act cannot operate validly under any

27   circumstance.  To show that the federal government has occupied the field of licensing

28                                                    - 4 -

1    sanctions laws, Plaintiffs will have to overcome IRCA's preservation of state authority

2    for employer sanctions by "licensing and similar laws."  8 U.S.C. § 1324a(h)(2).

3         Congress has extensive authority to destroy residual state police powers–to close

4    the fifty laboratories of experiment.  The protection of our federalism lies in Congress

5    having to do so clearly and having to answer for it.  "[T]he structural safeguards inherent

6    in the normal legislative process operate to defend state interests from undue

7    infringement."  *Geier v. American Honda Motor Co.*, 529 U.S. 861, 907 (Stevens, J.,

8    dissenting).  But no one answers for it when, from special knowledge of purposes and

9    proportionalities, the courts attribute preemption to Congress free of its own words that

10   are plain enough to citizens.  This would disarrange our federalism.  It would require a

11   bicameral majority to restore state power, rather than leaving state power as our

12   constitutional default position in the absence of a federal bicameral majority.  Plaintiffs

13   are unlikely to succeed in reading the express preservation of state licensing sanctions out

14   of IRCA.

15        Plaintiffs' conflict preemption, due process, and dormant Commerce Clause

16   arguments are even weaker.  To some extent they attack the edges of the Arizona Act, not

17   its core, on hypothetical facts not shown in this case.  To that extent their attacks are

18   directed at particular applications of the Act and are beyond this facial challenge.

19   Further, if any single provision fails, the Act's severability clause will save the remainder,

20   provided that the Act is not entirely preempted.

21        Plaintiffs do not have a probability of success on appeal, much less a strong

22   probability.  A mere "serious question" is not enough to suspend state action "taken in the

23   public interest pursuant to a statutory . . . scheme."  *Bery v. City of New York*, 97 F.3d at

24   694.  This shortfall alone requires denial of the motions for injunction pending appeal.

25

26

27

28

1    **III.   The Balance of Hardships Favors Defendants**

2          **A.     Plaintiffs' Hardship is Minimal**

3          Plaintiffs' hardship comes down to nothing more than the expense of using E-

4    Verify.  If the federal government's statistics hold true for Arizona employers, 85% will

5    spend less than $100 to set-up E-Verify and 75% will spend less than $100 annually to

6    operate the system.  The average employer will likely spend $125 in set-up and $728 in

7    maintenance of the system.  (Joint Statement of Stipulated Facts ("Facts"), Doc. # 152,

8    Ex. 52 at 104.)

9          The Act's E-Verify requirement is an increment to the already pervasive regulation

10   of labor and employment in our society.  A complaint that there is more cost to comply

11   with labor regulation has little purchase.  It is difficult to establish irreparable injury

12   based on prospective monetary damages alone.  *See Stop H-3 Ass'n v. Volpe*, 353 F.

13   Supp. 14, 18 (D. Haw. 1972) *rev'd on other grounds*, 533 F.2d 434 (9th Cir. 1976)

14   (citations omitted) ("Traditionally, the irreparable injury contemplated by Rule 62(c) is

15   that which will make the appeal moot.  Thus, prospective monetary damage is *not*

16   irreparable injury.").  While the cost of using E-Verify meets the minimum for standing, it

17   is not so great as to warrant an injunction.  *See Yniguez v. Mofford*, 730 F. Supp. 309, 317

18   (D. Ariz. 1990) *rev'd on other grounds*, 939 F.2d 727 (9th Cir. 1991) ("While Yniguez

19   has established a sufficient threat of enforcement to provide an actual controversy for

20   purposes of Article III and the Declaratory Judgment Act, she has not established an

21   enforcement threat sufficient to warrant injunctive relief."); *Lawson v. Hill*, 368 F.3d 955,

22   959 (7th Cir. 2004) ("Even if we are wrong to suppose the risk of prosecution too remote

23   to confer standing to sue . . . the district judge was right not to enter an injunction . . . .

24   [a]n injunction is an extraordinary remedy.").

25         Moreover, complying with E-Verify will have off-setting business benefits for

26   Plaintiffs.  It effectively ensures that they will be virtually immune from licensing

27   sanction proceedings.  *Arizona Contractors Ass'n v. Napolitano*, No.

28                                           - 6 -

CV07-1355-PHX-NVW, __ F. Supp. 2d ___, 2007 WL 4293641, at *11, 2007 U.S. Dist. LEXIS 90694, at *34 (D. Ariz. Dec. 7, 2007). Based upon past users' experiences, an overwhelming majority of Arizona employers will likely find E-Verify an effective and convenient tool for employment verification, (Facts, Doc. # 152, Ex. 52 at 140), and will rate the program "Excellent," "Very Good," or "Good" (Facts, Doc. # 149, Ex. 13 at 4).

Plaintiffs submit two declarations from Arizona employers who assert that they will have to spend much more than the usual amount to set up E-Verify. (Facts, Doc. # 150, Ex. 26 & 27.) Both are owners of franchise restaurants who allegedly will have to purchase computer equipment and dedicated Internet connections for each location to comply with E-Verify. One employer states that he will need to spend more than 82 times the national average to set up the system. Both declarations state bare conclusions. Neither displays any of the resourcefulness one expects from business people seeking efficient solutions to problems. The failure to explain and exclude other solutions leaves the court unpersuaded that either declaration states a likely true cost. Even if the declarations are taken at face value, their costs are minor compared to the cost to the State, others, and to the public interest from suspending the Act, as explained below.

**B.      An Injunction Will Injure the Direct Financial Interests of the State**

The State will suffer monetary damages from an injunction pending appeal. Its expenditure to inform every employer by October 1, 2007, of the Act and of the obligation to comply with E-Verify after December 31, 2007, will be wasted. 2007 Ariz. Sess. Laws, Ch. 279, § 3. (Facts, Doc. # 148, Ex. 6.) Giving individuals actual notice of the law, when it begins, and how to avoid risk by complying with E-Verify, was critical to the legislature's purpose of achieving effective deterrence with the fewest number of employers suffering actual sanctions. If the Act is suspended by court order, that legislative purpose of individual fairness will be defeated unless a new notice is sent in the event that the Act is allowed to go back into effect. Therefore, if an injunction were

1  issued, the court would require Plaintiffs to post a bond under Rule 62(c) to cover the cost

2  of a new notice.

3  **IV.     The Harm to the Public Interest from an Injunction Against Enforcement of the Act Would Greatly Outweigh Plaintiffs' Cost of Compliance**

4

5          **A.     The Arizona Legislature Has Declared the Public Interest**

6          The parties have submitted a number of expert reports and declarations concerning

7  the effect of immigration on the Arizona economy and wages.  Significantly, Plaintiffs'

8  studies do not distinguish between the effect of authorized and unauthorized immigration.

9  Only Defendants' expert, Prof. George Borjas, offers a conservative estimate of the effect

10 of unauthorized alien labor on authorized labor, both alien and citizen.  For this and other

11 reasons discussed below, the court finds Defendants' expert to be persuasive.

12         In any event, this is not an appropriate forum for second guessing the Arizona

13 legislature's decision that the public interest is best served by strongly deterring the

14 knowing or intentional employment of unauthorized aliens.  This court's "consideration

15 of the public interest is constrained in this case, for the responsible public officials in [the

16 State] have already considered that interest."  *Golden Gate Restaurant Ass'n.*, 2008 WL

17 90078, at *13, 2008 U.S. App. LEXIS 364, at *37.  The Arizona legislature, like the

18 federal government before it, balanced competing social and economic interests and

19 decided in favor of an economy for those authorized to work in the United States.  "[If it

20 were obvious that the [Act] was unconstitutional or preempted by a duly enacted federal

21 law[,]" there might be some basis to conclude that the public interest is not served by the

22 Arizona legislature's preferred values.  *Id.*  However, one cannot by any stretch of reason

23 describe the Act as obviously invalid.  It is therefore in the public interest that this court

24 exercise its "discretionary power with proper regard for the rightful independence of state

25 governments in carrying out their domestic policy."  *Id.* (quoting *Burford v. Sun Oil Co.*,

26 319 U.S. 315, 318 (1943)).  Declining an injunction pending appeal will allow the Act's

27

28

continued application, and therefore will "in a real sense, preserve rather than change the status quo." *Id.* at *3, 2008 U.S. App. LEXIS 364, at *7.

**B.    By the Most Conservative of Measures, the Balance of Hardships Favors the Defendants and the Public Interest**

In addition to noting the illegitimacy of disagreeing with the legislative body's preferred values, the court of appeals in *Golden Gate Restaurant Association* did assess the harm to the public and the beneficiaries of the challenged ordinance. *Id.* at *13, 2008 U.S. App. LEXIS 364, at* 35–37. Here also, the court is persuaded by Defendants' expert, Prof. George Borjas, that the number of unauthorized workers in Arizona is very substantial and that their presence in the work force drives down wages for competing authorized workers. For high school dropouts alone, wages are depressed by at least 4.7%, or about $950 annually. This exceeds $200 million per year just for those authorized workers. The numbers are far greater when including all authorized workers. (Facts, Doc # 150, Ex. 1 of Ex. 39 at 16.) Again, though these are gross estimates, Prof. Borjas has favored conservative figures.

Plaintiffs' experts are unpersuasive. Professor Marc R. Rosenblum, a political scientist and not an economist, offers general political arguments why employer sanctions have been ineffective and are a bad idea. While his historical narrative is helpful, his conclusions are not empirical science. Rather, they are speculations about the effects of the Arizona employer sanctions law, speculations which the legislature was not bound to accept. His conclusion that "[e]mployer sanctions depress wages for all US workers" is not persuasive, and the court does not believe it. (Facts, Doc. # 150, Ex. 36 at 9.)

The conclusions of Judith K. Gans, also not an economist, about the general benefits of immigration do not address the effects of unauthorized alien labor upon those whom the legislature chose to protect. (Facts, Doc. # 150, Ex. 35.) The opinions of Prof. Giovanni Peri (Facts, Doc. # 150, Ex. 38) also do not persuasively undercut the opinions of Prof. Borjas (Doc. # 159, Borjas Aff.).

1    These expert reports include, and therefore inappropriately attempt to give weight

2    to, the value of benefits produced by unauthorized alien labor.  The benefits in fact to

3    those who come to this country against the law to make better lives for themselves, to

4    those who save from lower cost labor and general depression of wages from employing

5    unauthorized aliens, and to those who enjoy the products of unauthorized labor at lower

6    prices, do not count.  The beneficiaries chosen identically by federal and Arizona law

7    prevail over all who benefit from unauthorized alien labor.  They are the authorized

8    workers in the United States who compete with unauthorized aliens.  *See Incalza v. Fendi*

9    *N. Am.*, *Inc.*, 479 F.3d. 1005, 1011 (9th Cir. 2007) (quoting H.R. Rep. 99-682(I), at 46, *as*

10   *reprinted in* 1986 U.S.C.C.A.N. at 5650) ("In passing IRCA, Congress wished to stop

11   payments of wages to unauthorized workers, which act as a 'magnet . . . attract[ing] aliens

12   here illegally,' and to prevent those workers from taking jobs that would otherwise go to

13   citizens.").  For these reasons, Plaintiffs' experts' conclusions are not helpful or

14   persuasive in balancing the hardships.

15   The court finds as a fact that the cost of complying with E-Verify for Plaintiffs and

16   all other Arizona employers is far less than the wage depression to the poorest Arizona

17   workers from unauthorized alien labor.  This effect on the public interest strongly weighs

18   in favor of allowing the Act's continued implementation.  Further, as persuasively

19   detailed by Prof. Borjas, there are other and greater costs to workers from the large

20   number of unauthorized alien workers in Arizona.  An injunction would retreat from a

21   status quo in which those with the least are getting a fairer chance at a small share of the

22   prosperity of our Nation.

23   **C.    An Injunction Would Forfeit the Deterrence Already Achieved**

24   There is good reason to think that the Act will significantly stem the increase and

25   reduce the absolute number of unauthorized alien workers in Arizona.  It reduces

26   employers' incentive to discriminate against foreign-appearing applicants, as E-Verify

27   use assures that they are safe in retaining or terminating any new hire.  Most frauds are

28

1    easily caught.  Unlike IRCA and the I-9 system alone, the Act apparently has a real

2    deterrent effect.  Unauthorized alien workers are more likely to cease their perjured

3    claims of authorization if they think their efforts will fail.  Employers may now accord the

4    verification process more of the seriousness that Congress originally intended, and even

5    identity theft may decrease as E-Verify includes photo identification.

6           Though no enforcement has begun yet, anecdotal accounts in the press indicate

7    that pre-enforcement deterrence is occurring; unauthorized aliens are leaving and some

8    wage levels may be increasing.  Of course, anecdotes are not proof of systemic

9    success—only the future can show that.  But an injunction pending appeal would stop the

10   future before it happens.  It would forfeit the momentum of deterrence that the Act

11   already has achieved.

12          **D.     The Public Interest Favors Learning the Effect of the Arizona
                    Experiment Before Congress Considers Renewal of E-Verify in
13                  November 2008**

14          Another factor in the public interest further disfavors an injunction in this case.

15   Though the Act could survive without E-Verify, that mandatory verification system

16   greatly aids the Act's economy and effectiveness, and provides easy avoidance of

17   liability.   The Act directly serves the interests of Congress, which is to experiment with

18   and refine the employment eligibility verification system.  Unless extended, E-Verify's

19   authorization will expire in November, 2008.  Basic Pilot Program Extension and

20   Expansion Act of 2003 ("Expansion Act"), Pub. L. No. 108-156, 117 Stat. 1944 (note

21   following 8 U.S.C. § 1324a (Supp. IV. 2000)).  Before then, Congress would benefit from

22   the experience of Arizona employers under the Act.

23   **V.     CONCLUSION**

24          Plaintiffs have shown neither a likelihood of success on the merits nor a balance of

25   hardships in their favor.  An injunction pending appeal is not warranted.

26

27

28                                        - 11 -

1    IT IS THEREFORE ORDERED that the motions for injunction pending appeal

2 (Doc. ## 181, 182, and 183) are denied.

3    DATED this 19th day of February, 2008.

4

5    _____

6                    Neil V. Wake
                 United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28